18-1496, Mark Sebastian v. Swan Wealth Advisors, Inc. Would both attorneys step up and identify yourselves for the record? Good morning. Brad Stavis for the appellant, Mark Sebastian. Good morning, Your Honor. It's Katherine Weiler for the appellant, Megan Swan. So, Mr. Stavis, what's the spelling of your last name? S-T-A-U-V-U-S, Stavis. Mr. Stavis, there was a motion to supplement the record. Yes. And did you get notice of that? We did at the end of the day yesterday, Your Honor, if I may. And the court may be about to address this. Our only concern about the motion is it appears that the motion to supplement the record was filed directly with the appellate court. We don't believe there was anything filed with the trial court, so I'm not sure that it's been properly prepared at this point. Okay. So you haven't really had a chance to see it? That's correct. All right. Well, then why don't you either file something in writing either agreeing or opposing to it within five days? That's fine. All right. Is there any question, though, that the motion to reconsider was not included in the record by mistake of the clerk of the circuit court? My understanding, and again, Mr. Stavis certainly can speak to this if I'm incorrect, the documents absolutely were filed with the trial court and were before the trial court when the decision was made below. All or the two affidavits as well? That's correct. Okay. However, they were filed under seal, and I don't believe that the documents filed under seal were ever submitted to this court. So I don't mean to – I'm not trying to mislead the court about anything that was in front of the trial court. Just as a matter of procedure, I don't believe that the sealed documents were ever submitted to this court as part of the record. So when the court asks us if they were part of the record, they were before the trial court below. Were they part of the appellate record? I'm not sure that they were. All right. So within five days, you can either agree or not agree or whatever, and then we'll take it up. Is that fair enough? Yes. All right. Okay. All right. Then, Wyler, you may be seated, and, Mr. Stavis, you may proceed with your arguments. May it please the Court, Counsel? One of the primary reasons that the trial court granted summary judgment in this case is that they felt that Mr. Sebastian did not travel to Durango, Colorado on a consistent basis provided for in the employment agreement. And I'd like to start – Wasn't the trial court two bases? One was that the work was unsatisfactory, and then the other was that your client didn't travel, as you indicated? Yes. Yeah. I think from my reading, the primary reason was the travel. However, and the reason I wanted to start with the travel is because going through the analysis of that particular issue gives us a good roadmap of how these other issues have to be treated in a summary judgment context. So for the travel situation, the first issue that the court would need to look at is to determine whether or not the employment contract in this case was clear or whether there was any ambiguity. In the lower court, we argue that it was ambiguous. It contains language with regards to this particular issue of approximately, it says, and on average, it has to be somewhere at a certain point in time. A week. It doesn't even say a number of days, does it? Correct. It says approximately one day a week in a month on average, I think. I can get the exact language, but that's – I thought it was he was supposed to travel about a week every month on average. Not a day. It was employees shall be expected to spend approximately one week per month on average at the company's offices. Yes. Okay. So the first step would be to determine whether or not that particular language. Did he ever spend a week? I thought the testimony was that he never spent a week there. I'm not sure if he spent an entire week at one point in time. So over the course of the employment, how long was the employment? The employment was not even a year. I think it was June, about eight months. Okay. So in that eight-month period, do we have any indication of how much time was spent in Durango at all? Yes. It's clear in the record about how much time he spent there. So how much time was there? I think if you added it up, it was a few weeks. I can tell you I will concede that it was not one week per month. Right. There were at least six months where he was able to demonstrate travel out to Durango. Yes. Yes. And if we were to say a strict reading of the agreement and say, okay, you have to be out there one week per month and the contract was eight months, was he out there eight weeks in Durango, I will concede that he was not. However, I don't think that's the end of the analysis. Can I just interrupt you for a minute? So once he was brought up, once the fact that his work was unsatisfactory brought this attention, then Swan and your client were communicating via e-mail about maybe trying to work out the agreement or the terms of the agreement and so on and so forth. But in those e-mails, also, your client indicates that he didn't comply with the one-week-a-month provision in the contract. He says, I'm going to make my best efforts to comply with that part of the contract. Yes. So I don't understand what's the issue then. Because your client even himself in the e-mail exchange indicates that, I didn't do what I was supposed to do under the contract. Sure. I don't think we're trying to sidestep that particular fact, that he was not out there for eight weeks over this period of time. But, again, that doesn't end the analysis. Well, maybe this helps. You can't just have a breach. It has to be material. Yes. Generally, that would be a question of fact, wouldn't it? Correct. If the parties have a disagreement about the language, and the language here says, about or no, shall travel an average of one week or, I'm sorry, what's the first? Approximate. Approximate one week on average. So that's the language of the contract. Yes. And one of your arguments is that is extremely vague in terms of whether, you know, that means five days every week, a certain week every beginning of the month, and then you argue whether that was really a material breach would be a question of fact. Yes. And the case that we cite is this Gayhart v. Wilson UTC case. It was argued in the briefs. In that case, it was a northern district case applying Illinois law, and it was very similar to this case. And the analysis that that court went through, the district court went through, was it was a contract with an executive who was supposed to relocate out to New York. That executive was terminated after about six months. And he never relocated. And he never relocated. And the court said that that was a question of material fact about whether or not the contract, that there was a breach of that provision. Yes. The court actually found, oh, there was a breach, but whether or not it was material is the question. And that's where I'm going with this, is that some of that argument might have been lost to some of the briefing, that this has to really be a material breach. In addition to your Honor's comment, there were communications between the parties after some of these issues came to light, and there were some communications, mostly in March, which I believe Swan is testifying or alleging that those were the notices that were required under the contract. After that happened in March, in April, the parties then reached an agreement where Mr. Sebastian was paid a reduction in salary. So our argument is that at that point in time, the slate is essentially wiped clean as of April. And if there has to be, if there's more material breaches. Were there some communications in May about two options, or was that March, when the company basically said, well, we don't really want you to leave, but we want you to renegotiate and get rid of the bonus or the, I'm sorry, the provisions if the company was sold and a reduction in your salary? Well, the two option was in March. However, there were those types of conversations even later. At the end of May, even at the beginning of June, a few days before Mr. Sebastian's terminated, there were communications saying, we'd like you to continue to work here. We want you to continue to work here, but we have to renegotiate your employment contract. And Mr. Sebastian said, well, he wanted it as well. He said, either hire me as an employee, or if you want to use me as an independent, you know, let's work out some contract. Yes, yes, there was that. However, he was clear that he did not want to give up his rights, that if they terminated him for cause, he would be paid his severance pay. He was clear on that all along. That was never negotiated. He said, I'm entitled to that. We negotiated that eight months ago after I was a consultant for you for a number of months. You hired me. You gave me this contract, and that's what we negotiated eight months ago. Isn't one of your positions that the jury should be able to decide, or fact finder, whether or not this was a – that there was an effort to get rid of him because of the million-dollar payoff, that the controlling interests were sold, or to get his salary reduced because they felt they overpaid him, and that that was really the reason why they eventually said we're terminating you for cause? Yes, there was a memo by one of the principals at SWAN where there was an indication that they were trying to sell the company, and I think they looked at Mr. Sebastian's contract, and they probably thought, hey, he's not working out like we thought he would. That doesn't mean it's for cause, but he's not working out like we thought he would, and we don't want to have to pay him this money if we sell this company, and we're considering doing that. Well, if they sold the company or a controlling interest, they were going to have to pay him a million dollars, weren't they? Yes. Okay. There's no question about that? There's no question about that. He would be entitled to that, yes. All right. So just briefly, just getting back to your interpretation of the agreement regarding the week thing, you're saying that the approximately is what makes it ambiguous? The language approximately and on average. Okay. What about shall be expected to spend? I mean, that is pretty definitive in terms of they're expecting him to be in Colorado, right, at least one week out of the month. Approximately. Approximately. On average. It's like totally different than shall be. Yeah, and I understand that there might be some. Didn't he say the brother gave him permission to, you know, miss here and go somewhere else, and then didn't he start traveling to Puerto Rico or something? Yeah, well, there was. So if we get over whether it's ambiguous or not, then we look at questions of fact as to whether there was a breach, and that is whether Robert gave him permission to or excused him from coming out or he traveled to other locations. And then even if we get beyond that, we say, is it material? So there's really so many hurdles here that Swan has to overcome. What about for cause? Well, that would have to be a material breach of the contract. And for cause is obviously very serious. I thought it was gross. I thought the parties agreed. It's gross what? Well, there was a provision of gross negligence as well. Gross negligence is not defined. No, but gross negligence does have some sort of meaning in other cases, and isn't that one of the cases in your? Yes, yes, and I would suggest that the definition or the, you know, gross negligence would even be higher than material breach. Well, isn't that generally a question of fact anyway? Yes. Yes. But the court concluded here, did the court conclude here that he was grossly negligent? Well, I. Or did it not? It didn't really say precisely whether it was under, there was three different provisions under which he could be terminated for cause. The first one, I think, is clear, didn't apply. It was for dishonesty, things like that. The next two, one was material breach and the other was gross negligence. And the court really didn't articulate it's under this specific, you know, provision. Well, wasn't there testimony back and forth about whether this project that he was supposed to do was really, didn't they have different opinions about how significant it was and the time frame that it had to be done? Right. Well, that's the trading manual. And the trading manual at one point, you know. So your argument is there's questions of fact. They had varying interpretations about this project that he was supposedly assigned to do. Yes. Would your argument be, I'm sorry, that that would have had to have been gross negligence on his part to amount to a forecause? Yes. All right. Now, does the contract itself anywhere define what gross negligence is? It did not. Okay. So in your interpretation of gross negligence based on the contract is what? Well, first I would say if there's no definition it should go against SWAN because they prepared the contract. But gross negligence, I could not find any case law in Illinois that would define gross negligence in this context. In an employment. In an employment agreement context. However, in other contexts it's, you know, a wanton disregard of the rights of others and a conscious, voluntary act or remission in reckless disregard of a legal duty. So. All of which are subject to actually the general basic notion that those are questions of fact for a jury or a back finder judge to determine. Yes. Generally those questions are never resolved as a matter of law. Correct. But that's what the court did here. Yes. So is it your position that under this contract there really never could be any gross negligence, right? Well, that's a question of fact as to what is gross negligence. That's for a jury to determine. Under the contract. I mean, I'm just, you know, focusing in on the language of the contract. I mean, based on your interpretation of the contract, there never really could be any gross negligence. There could be, but certainly the conduct here didn't rise to that level. And your argument is that it's a question of fact. Not that gross negligence can never exist. Of course it can. And it's in the contract. The question is whether the court should determine that based on these facts that were presented at summary judgment, whether his conduct amounted to gross negligence. Yes. And you're saying the court overstepped when it made a conclusion in that regard when there was differing testimony about this particular project that he was assigned to do. That's correct. So it makes determining the contract really meaningless, right? I'm sorry? It makes determining the contract meaningless, really. What do you mean determining the contract? The language, gross negligence. No. No, I don't think it makes it meaningless. I think, again, in the context of what was done here, it's one for a jury to determine whether it was gross negligence. And it certainly didn't rise to the level of what could possibly be gross negligence. Would you say poor performance equates with gross negligence? If it was poor performance, they should have put that in, poor performance. No, that's why I'm asking you, is there any case law that would ever even suggest that poor performance is equal to gross negligence? No. So it does have some meaning. Yes, I think it does have some meaning, yes. Okay, what about the attorney fees? Well, our argument is that if they are the prevailing party or they're the non-breaching party, that the provision in the attorney fees, which should be strictly construed, was construed too broadly by the trial court. Well, isn't it, don't the provisions for the fees come in after several provisions about intellectual property, not competing, trade secrets, that sort of thing? Yes, typically in these types of contracts, and we do some employment contract work, those types of provisions are contained in the confidentiality, non-compete, and things like that, where you're entitled to an injunction, a temporary restraining order, and things like that. So if you read it in the context of, that's when you would be entitled to those things, that's our argument that we made in the brief. Well, have you ever seen a contract where someone's fired because they did a bad job or whatever, and then the company that fires them gets attorney's fees for firing them? Well, that kind of goes to an equity argument, really, Your Honor, because they filed a counterclaim. We filed a complaint, they filed a counterclaim, and now being penalized because we basically did a bad job. Well, I mean, have you ever seen any kind of a general kind of clause like that? Other than, you know, I mean, we're all familiar with attorney's fees when there's a breach of confidentiality or there's a breach of, you know, they're competing in violation of the contract, or they disclose trade secrets, but, no, I'm just saying, I'm not familiar with a contract that would allow an employer to get attorney's fees because they fired their employee. I'm sorry, I misunderstood. I have never seen a provision like that. I've never seen anything like that. I just was curious if you had ever seen a contract that allows an employer who fires someone for doing a bad job to get attorney's fees from them afterwards. I have a question about Option Pit. Is he still involved with Option Pit? Mr. Sebastian is still involved with Option Pit, yes. Okay. But didn't he indicate, and in the record appears he indicated that, that he was going to remove himself from Option Pit because there was an agreement that he was going to be involved in it, but by 2014 he was going to remove himself from Option Pit and then just, you know, concentrate on the work for SWAT. Yes, well, the contract does acknowledge that he works for Option Pit and will continue to perform services there. One of the issues that was raised in this March timeframe was, we think you're spending too much time on Option Pit. He disputed that as to whether or not he was spending too much time on Option Pit. And in this March correspondence back and forth, there was an indication that I will try to divest myself even further from Option Pit. But it was always in the contract. They always knew that Option Pit was there. There was never, you know. But he had indicated that he was going to at least try to do it by 2014. I'm not aware of that particular reference. One of the exchanges, that's what appeared that he said, that he realizes that he's spending too much time on Option Pit and that, you know, he's working to divest himself from Option Pit and it looks like he'd be able to do it by 2014. Okay. Yeah, I'm not aware. I mean, the contract was from October. He was a consultant for a number of months before. Then they hired him in October of 2013. These correspondence exchanges went back and forth in March of 2014. So it might have been a reference to, you know, throughout this year, I'm going to search to divest myself. But he was terminated two months later in June of 2014. And then I just want to focus on one exchange where Swan tells your client to stop working on a project after he turned in what they considered to be And then your client responded by saying that he was embarrassed, he had made a massive strategic mistake, and he recognized that he could be fired. Now, why isn't that enough to show that there was no issue, no general initial material fact regarding his firing for cause? Well, first and foremost, they could fire him for poor performance, but not for cause. So he might have said, you can sue me, but you have to pay me then under the contract because I'm not terminated for cause. So they could have just, it was an at-will employment, but in certain circumstances, it's not for cause. They have to pay him severance. And he certainly did dispute what he did with that particular project. And that's, I think, a primary example of just, it was maybe a poor performance. You know, the employee didn't do everything they could have done, and he felt bad about that. He said, I did it in a way, it was an algorithm. He did it in a certain way rather than kind of the computer version of it. And he said, strategically, that was wrong. In hindsight, I probably could have done it better. But that's not a for cause. But what about his statement saying that he could be fired for it? He realized that he could be fired for it. Well, I think Mr. Sebastian understood under the contract he could be fired at any time because it was at-will. It said in there this is at-will employment. However, if you're not fired for a cause, you get paid. So I don't think we've ever said that he couldn't be fired under the contract. Anything further at this time? Not at this time. Thank you. And we'll allow you some rebuttal. Thank you. Good morning, Your Honors. Good morning. Catherine Weiler for Swan Wealth Advisors. The circuit court's order granting summary judgment should be affirmed. I recognize the Justice's questions related to whether there are issues of material fact in this case, which should have gone to a fact finder. Here, they should not have. And, Justice Reyes, I think you've addressed some of the reasons why, particularly exactly the email Your Honor was just referencing. Mr. Sebastian understood that he was not performing at all. He was not satisfying any of the obligations identified in this contract that were later identified in specific correspondence from Randy Swan advising Mr. Sebastian of the extensive performance issues, the extensive concerns that the company had about his satisfying the requirements of his contract. But was he fired for cause? He was fired for cause. And what was the cause? It was multifactorial, Your Honor. What were they? First of all, we start with this question about travel to Durango, and I realize there were some questions about the specifics of that. Let me identify the three areas of cause, then I want to get back to the specifics about Durango. First, this travel to Durango requirement, which is specified in the contract. Second, there were issues related to SEC. What does approximately mean? Approximately is defined in the specific language of the paragraph. Excuse me, not approximately, but the language of the paragraph identifies approximately one month, one week per month on average at the company's offices in Durango. What does approximately mean? Approximately means? Approximately what? Roughly. Roughly. Okay, so it doesn't even mean one week, does it? But we're not just talking in this case. Well, does it or doesn't it? What does approximately mean? It doesn't mean one week. If it were to say you must be in Durango one month, one week out of every month, we wouldn't be here, would we? The language says employees shall be expected to spend approximately one week per month on average at the company's offices. So conceivably, under this provision, there could be circumstances in which Mr. Sebastian did not spend a full week at the company's offices in Durango. But what is specified here, and there's a… What does on average mean? On average means? It doesn't really have to be every month, does it? And it doesn't have to be five workdays, does it? That's true. However, your… Our testimony wasn't there. At all. About what Mr., what's his name? Sebastian. Sebastian, yeah. He testified about how often he did get out there, didn't he? He testified to the following, and this is a question that you had, Your Honor. In November, no travel to Durango. In December, three days. We're not talking about four days. We're not talking about a full week, three days. January, no travel to Durango. February, four days. March, no travel to Durango. April, two days. May, one day. When did he go to Puerto Rico? I have to… I believe, Your Honor, that that was in… I believe that was in April, but I'd have to double check the record. I'm not positive. So you're saying that a judge, a trial judge, could actually find, number one, that there was a breach of the provision approximately on average. Not only find there was a breach, when Sebastian also said that the brother gave him permission not to be there for four days, some, I forget, February or whatever, and that going somewhere else wasn't, you know, part of this race, approximately a week per month on average. You're saying, as a matter of law, that a judge could decide that was a breach and it was material to the terms of the contract. Yes, Your Honor, for two reasons. Give me a case. Give me a case that suggests your interpretation of this clause is something that a court has actually ever determined. I have not seen a case that interprets a mandatory travel requirement and interprets it based on similar facts. A mandatory travel requirement that actually has in its components approximately and on average. And the way the trial court interpreted it, I believe is instructive. This is on page three of the trial court's summary judgment decision. It's in the appendix at page eight. Accordingly, over the course of his roughly six-month employment with SWAN, Sebastian spent only ten days in Durango, averaging less than two days per month. The trial court made that calculation, averaging approximately two days per month. When you look at the language of this provision in paragraph seven of the employment agreement, it requires that you spend approximately one week per month on average. Those are not the same. What case would you say actually supports this decision? The decision. This wasn't really a, this was more like a bench trial than anything else. But SELCH versus Columbia Management supports the court's decision. It supports the court's decision because the facts in this case are not disputed. Mr. Sebastian does not dispute that, in fact, yes, those were the days on which he traveled to Durango. And the travel question is not the only basis of the trial court's decision. It is absolutely one of them. And it is certainly a basis on which the trial court could grant summary judgment for SWAN. But in addition to that, there are other bases in the record. And the facts underlying those bases, and the court asked what those are. That includes violations of SEC regulations and FINRA regulations. And it includes, most importantly or most notably, these performance-related issues about which Mr. SWAN repeatedly advised Mr. Sebastian there were problems. Was there a notification to the SEC that this was a voluntary termination? There was a notification that it was a voluntary termination. That's correct. Does that raise the question of fact as to whether or not there was ever any cause? It does not, Your Honor, because the record, the reason Mr. Sebastian was required the basis of this discussion about FINRA and SEC violations, if I may, is SWAN is a company in a highly regulated industry, and as the court is aware, they are required to follow those regulations closely. Mr. Sebastian frequently appeared as a pundit on cable news. He had a blog. He was a regular presence in social media, I believe. And there are potential complications related to SWAN's business practices, depending on what Mr. Sebastian represents or states in those appearances or in those blog posts. That's why those need to be cleared through SWAN's chief compliance officer before those appearances happen or before those blog posts are made. There is no dispute here, and this comes back to what I was saying about undisputed facts. There is no dispute that Mr. Sebastian, even after he was reminded, you have these mandatory compliance requirements. It's in your employment agreement. You need to follow those mandatory obligations. Even after that, Mr. Sebastian says he did his best to advise the chief compliance officer or CCO of the company of these blog posts and media appearances. He didn't do that frequently. And the ramifications of that, I'm sorry, just one last point on that, are that that could create a significant problem for SWAN. Did it here? It doesn't appear so from the record because there was no filing with the SEC or FINRA about that, but it could. Why would it cause a significant problem for SWAN? If Mr. Sebastian went on TV or there were a blog post or something where, say, for example, he was recommending a particular trade, and that particular stock or that particular company or a client or a stock owned by SWAN, that creates a regulatory issue. And I am not a compliance attorney, so I can't get into greater detail about that, but there are facts in the record about that. You know that project that he was supposed to do? Yes, Your Honor. What's the timeframe of that? The timeframe was not clearly articulated in the employment agreement. SWAN readily admits that. However, that's why this communication that came up over the course of Mr. Sebastian's employment becomes so crucial to this consideration of whether there was a question of whether Mr. Sebastian understood there were performance issues here. So you don't know when that was supposed to be completed? Mr. Swan stated in his deposition, and I believe it's in some of the correspondence, he had expected it to be completed, I believe he said relatively quickly, which when we're talking about a start date in November, he was expecting it sometime in January or February. There is no question, though, that by March, the manual project, if we can call it that for ease of reference, was not finished yet. And even Mr. Sebastian acknowledged in his April 8th correspondence. Let's talk about whether it's really a material breach, okay? Because at the middle of March, Mr. Swan is trying to renegotiate Mr. Sebastian's contract. Mr. Swan is saying in his correspondence, you're not performing the way we expected you to perform and the way we agreed. Maybe we're talking about two different things. I'm talking about the email about two options. Yes, that's the March 11th email. Right, that's what I'm talking about. So why is he attempting to renegotiate in March with this person that you're saying has fallen down on the job? Because Mr. Swan wanted, he believed, and he says this, both in his correspondence and it's in his deposition, he believed that there was value in this relationship between these two. Here's his words. The first, Swan's preference, is to mutually terminate the existing contract, waiving execution of any existing terms and to enter into a new agreement. Specifically, all terms for a buyout, conditions for termination, conditions for sale, et cetera, will be waived consistent with all other employees of Swan. Then, while Swan is disappointed that expectations have not been met, we remain convinced that you can deliver unique value. And then he talks about the second option. So you're saying that a court, as a matter of law, cannot, couldn't interpret this any other way than your interpretation. That's not the only document that the court looks to in evaluating whether there was misconduct. My question is about what does this mean in terms of the actions that took place? There was a million-dollar payout, wasn't there, for this man, if they sold this company controlling interest? A controlling interest, which did not happen and was not offered. No, I understand. But it was in the contract, wasn't it? Yes. And there were efforts to sell, and part of the company was sold, was it not? That's true. And aren't we supposed to give all reasonable inferences to the facts when we decide whether or not there's questions of the fact that a jury or a judge should decide in a trial, as opposed to as a matter of law on summary judgment? Absolutely, Your Honor. But you don't think this was a bench trial? No, Your Honor. All right. Specifically to that point, two reasons. One is because there was never a change of controlling interest on the table. There was an effort to sell. There was an effort to sell a minority share. There weren't any buyers, but there's absolutely no question in this record that this company wanted to get rid of the million-dollar payout, they wanted to get rid of the conditions of termination, they wanted to waive any and all provisions, and they wanted to reduce his salary. Eventually his salary was reduced. I'm sorry. I don't mean to interrupt the Court. No, go ahead. There is nothing in the record that suggests there was ever any interest in selling a controlling interest in the company. And, in fact, both Randy Swan and Rob Swan's depositions demonstrate, and even their relationship with Mr. Sebastian. But why did they want to get rid of the million-dollar payout? Because they didn't think that Mr. Sebastian had earned it, just like he hadn't earned his salary. They negotiated that sight unseen. That's true. They negotiated a million-dollar payout. So that's something they did in an arm's-length transaction. It wasn't a matter of, well, we didn't really think so at the time. You can't do that. You can't go back when you've negotiated a contract and say, oh, well, now we've decided you don't meet that, so we want to renegotiate. So all those things militate against the judge, in this case, entering a finding as a matter of law that Swan was entitled to judgment. The concerns that Swan had at that point in time were Mr. Sebastian had not come to Durango as requested, and I realize the Court's looking at the March 11th correspondence. The March 25th letter from Randy Swan details the seven different ways in which Swan is frustrated and disappointed in Mr. Sebastian's performance and has concluded he is not performing in the manner expected through the employment agreement. The reason I point to that is because that's where we get into some of the specific problems that the trial court identified, and that includes travel to Durango, and it also includes this issue related to the trading manuals. Now, understanding that, the problem here, what the trial court ultimately made its decision about in finding that no reasonable trier of fact could come to a different conclusion, that there was a termination for cause in this case, is because when the Court considers that March correspondence with Mr. Sebastian describing exactly what the issues were with his employment and why he was not satisfying his employment agreement, Mr. Sebastian responded in April. He agreed. He agreed that these trading manuals were late. He recognized his poor performance. He agreed that he would adjust his performance level, and he agreed to a reduction in his salary in recognition of exactly that, of his performance issues, of him not performing in a manner expected under this agreement. And after Mr. Sebastian made clear that he agreed with all of the concerns expressed by Randy Swan, he did nothing. Nothing. Until May 22nd, when finally Randy Swan informed him by e-mail, that's it. That's it. We're still waiting on these trading manuals. You still haven't done the job. You still haven't come to Durango. Is there any question about the notice here? No. There's no question about it. I thought the contract actually requires that he be notified by mail at his address. The contract required that he be given notice, and there is language in the provision, and if the Court bears with me, I can find it, that specifies that e-mail is an appropriate manner of service. There's an e-mail address. It said that service shall be at the address below. And there is no question that Mr. Sebastian was informed in March of the issues related to his performance. Now you're saying he was terminated in March, and that was the notice? No, and I don't mean to – I'm not trying to – Well, what is – I mean, you're saying that the contract is clear and free from doubt that e-mail notice was appropriate in this case. And that there was e-mail notice of the notice. But the contract says that the notice shall be given to the address below. The notice that's required, they're all notices of communications. There's no – and Judge Atkins, I believe, references this in his ruling, that there is no question, and certainly Mr. Sebastian has not suggested he was never given notice. This isn't a situation where Mr. Sebastian was somehow denied the opportunity to address the problem. He did. Well, the question is whether or not there was a question of fact regarding notice or not. You're saying there's no question as a matter of law. I understand your argument. Okay. Let's talk about the attorney fee issue. All right. Are you aware of any contract? Or do you read all of these provisions in the contract together? I do, yes, Your Honor. All right. So aren't those attorney fees specifically provided for if there's a breach of the company within a certain period of time or everything related to the intellectual property that was so important to it? No, Your Honor. Why? I'm sorry. I didn't mean to interrupt. No? No, Your Honor. Okay. Are you aware of any contract or any case, I mean, anywhere where someone who fires an employee can get attorney fees because they fired that person for doing a bad job? I am not aware of a published decision that addresses that. Are you aware of any decision published, again, where someone had a provision in a contract that would permit them to get attorney fees because they fired an employee for cause? I am not, Your Honor. But there are two issues with that. Number one is, I believe everyone in this room would agree, the parties are free to contract however they wish. Yes, they are. Absolutely. And number two, which is even more important, this provision does not allow an employer to go after an employee simply for doing a bad job. This provision allows an employer to go after an employee for an alleged breach of contract, which is what was alleged here. SWAN brought a lawsuit. They brought a counterclaim alleging breach of contract. That's what the trial court agreed happened here, and that's why SWAN was entitled to those attorney's fees. It's not just doing a bad job. It's breaching your employment agreement. Yes, and like I said to you, are you aware of any case, anywhere that has a provision like this the way you're interpreting it? In other words, we're firing you. You did a bad job. We get attorney's fees from you because you did a bad job. Or the alternative, we have an employment agreement with you. We're firing you for cause, and we get attorney's fees when we fire you for cause because we deserve those. If there were need of attorney's fees, but there wouldn't normally. I'm just saying, are you aware of any case, and are you aware of any employers that have anything resembling the interpretation you're suggesting today? I'm not aware of any case. Does that indicate anything to you? It does not necessarily, Your Honor. And for other reasons, such as? Well, if it were such a routine matter, and people were routinely being employers, were routinely being given attorney's fees because they fired someone for doing a poor job, or because they fired them for cause, we would have cases like that. The issue here is related to, and I recognize that. But the court has interpreted this contract unlike any case you're even aware of. I believe the court interpreted this contract based on the language of this contract, which is not ambiguous. I don't think it's ambiguous either. I think it clearly sets out when those fees will be obtainable, and it's following all the provisions regarding trade secrets, confidentiality agreements, when the person goes and works for a competitor in violation of the contract. Those are standard. They're routine. We see them all the time. They're in cases. But what the court did here was interpret this contract in a way that I've never seen in any case anywhere, and I'm not aware of any standard employment contracts that would ever give an employer the right to get attorney's fees when they discharged an employee. I don't believe. Oh, I'm sorry. It's just not even heard of, let alone it's not in any case anywhere, and you've conceded that. I don't believe that this is a standard employment contract, and that seems clear from the language, particularly at the beginning of the contract, which is very carefully tailored to this specific relationship. And that comes back to Judge Atkin's finding about whether or not Mr. Sebastian, in this case, based on the undisputed facts here, was terminated for cause. He was. Okay, so let's take this other example. Let's assume, would you then at least concede that this is an ambiguous provision, whether this employer can get fees for an employee who did a bad job or who was fired for cause versus the provision should only be interpreted the way that most cases interpret these particular provisions? Is that ambiguous then? No, this provision is not ambiguous, and because it is not ambiguous, it should be interpreted in the manner in which it is written. The manner in which it is written allows SWAN to get attorney's fees in this case. Judge Atkin's correctly made that point. So then I guess my final question is, if it is ambiguous, then what? If it is ambiguous, then the court looks to the circumstances of this case and the party's understandings of this provision. And if the parties have a different interpretation, each of which is reasonable, then the court has to go on and consider parole evidence, doesn't it? Yes, it does. So if nothing else, if this provision is ambiguous, and it appears that there's nothing like this anywhere in all the law books that we're aware of, you're still saying it's unambiguous. But if it were ambiguous, you would at least concede that the trial judge should have taken evidence on this particular provision. Correct. Did you restate that, Your Honor? I do not concede that this is ambiguous. Yes, I know. In the event it were ambiguous, yes, of course, the trial judge could consider parole evidence. All right. If it is presented to the trial court. Sure. That's correct. All right. The contract doesn't define gross negligence. So what does gross negligence mean under the contract? Gross negligence, and that is correct, the term is not defined in the contract. But we looked, as the court has noted, at the entirety of the contract. And this provision, which discusses for cause, includes a number of different examples. So, and as Mr. Stavros noted, Section 1, by reason of willful dishonesty, I think the parties do agree that there's not willful dishonesty going on. But subsections 2 and 3, which are material breach of this agreement or any other agreement by the company or employee, or by reason of the employee's gross negligence or intentional misconduct. This is, again, where we look at exactly what happened between March and May of Mr. Sebastian's employment. Mr. Sebastian was told repeatedly, we expect you to be in Durango, we expect you to finish this project. If you do not, we want to keep you as our employee, but we are going to have to change the terms of our relationship if you do not satisfy those requirements. He did not do that. And, again, Justice Reyes, as you noted, and it's a good place for me to end without further questions from this court, that is exactly the type of conduct Mr. Sebastian acknowledged in May. He recognized his conduct was such that he may well be fired. The context of that particular message is important, because this is not just a situation where Mr. Sebastian was acknowledging that, yes, it's an at-will contract and maybe I can be terminated, but you'll still owe me my termination. Those are all true statements. Those are true statements, but the context of the email in which Mr. Sebastian stated, in case I am not fired, is important. Because in that email, he initially suggests a retroactive reduction in his pay, 5%, 5% retroactive to May 1st. Do you believe that the court had to conclude it was gross negligence? Yes. And you're saying, would you also agree, though, that gross negligence is generally a question of fairness? Generally, yes. But as the court is aware- What case would you cite, then, to support the judge's finding of gross negligence here in this employment setting? Two things, and I do want to answer the court's question. One is that the court found either a material breach or gross negligence. I believe that Judge Atkins suggested that either would be an appropriate interpretation here. And to answer the court's question, Selch versus Columbia Management is what gives us the ability to reach that conclusion. The circuit court correctly decided that a reasonable trier of fact could not differ in drawing inferences from the facts that are not in dispute. Here, the facts are not in dispute. The facts about the relationship between these parties and Mr. Sebastian's performance are not in dispute. Didn't Mr. Sebastian say in his deposition, one, he did not believe that one week, approximately one week on average, was a material provision? Can I answer the question? I didn't want to interrupt you. He answered that he did not believe that Randy Swan thought it important that Mr. Sebastian be in Durango. Okay. That was his answer. Now, his interpretation is not a reasonable person's interpretation. The questions before Judge Atkins were, was there a breach of the language of the agreement? How could you possibly say that when the language itself is so vague, it's almost subject to no interpretation at all? The language of the contract says, you are expected to be in Durango approximately one week per month on average. And there cannot be. He also said, though, he said he didn't think that this was a really material concept that they had agreed on. And you're saying that a person can't say that or it has to be, it should automatically be rejected. What I'm saying is more than just that, Your Honor. Not only is it not just Mr. Sebastian's post hoc excuse for why he didn't want to go to Durango, which is not the only basis is not a way to necessarily create a question of fact. It's also necessary in this case to look at exactly what was the context of how his employers were addressing the question of his travel with him. And that's, again, where we look to these written reminders and reprimands from Randy Swan saying in the March 24th message. Two or three days a month or whatever, and getting excuses from Randy or whoever. Mr. Swan himself is telling his own employee, we don't want to lose you. We just want to get rid of certain things in the contract we don't like. We want you to conform. Does not that suggest there's a question of fact as to how that particular provision should be interpreted? No. It suggests that Swan wanted to continue its relationship with Mr. Sebastian and was trying to find a way to make that work for both sides. And ultimately at the end of the day, after all of this conduct, Swan made the decision we can't make this work. We are terminating you for cause. We've given you chance after chance. You haven't taken it. That's it. If there are no further questions from the Court? Nope. We'll hear a brief rebuttal. Thank you, Your Honor. Mr. Stavis. Just very briefly, the counsel mentioned the Selich decision. In that particular case, in Selich, gross negligence was mentioned. However, that case was not decided on the gross negligence standard. In Selich, it involved an employee who went into, I think it was a boardroom, and pulled down his pants and mooned everyone. So I don't think Selich would apply in this particular case, and it certainly didn't give a definition of gross negligence in an employment context. Second, and finally, and if there's any questions, I'll answer those. On this compliance issue, counsel acknowledged that there were no compliance issues. The U-5 form concedes that. It's filed under oath that there were no compliance issues whatsoever with Selich. Really, it comes back to what Your Honor said, and that is if Mr. Sebastian would have been there in Durango five days a week, the trial court would have never found that there was any kind of breach here, and that's really what it comes down to. That's all I have. All right. Thank you, Mr. Stavis. Thank both of you. This case was very well-argued, well-briefed, and we will take it under five days when the Court stands.